John P. Aldrich, Esq.
Nevada Bar No. 6877
ALDRICH LAW FIRM, LTD.
1601 S. Rainbow Blvd., Suite 160
Las Vegas, Nevada 89146
Telephone: (702) 853-5490
Facsimile: (702) 227-1975

COHEN MILSTEIN SELLERS & TOLL PLLC
Christopher Lometti
Richard Speirs
Daniel B. Rehns
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Excavators Union Local 731 Welfare Fund, Derivatively on Behalf of Nominal Defendant Wynn Resorts, Limited, | No. |
| Plaintiff, | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| vs. | |
| STEPHEN A. WYNN, LINDA CHEN, RUSSELL GOLDSMITH, RAY R. IRANI, ROBERT J. MILLER, JOHN A MORAN, KAZUO OKADA, MARC D. SCHORR, ALVIN V. SHOEMAKER, D. BOONE WAYSON, ELAINE P. WYNN and ALLAN ZEMAN, | JURY TRIAL DEMANDED |
| Defendants, | |
| – and – | |
| WYNN RESORTS, LIMITED, a Nevada Corporation, | |
| Nominal Defendant. | |

1    Plaintiff Excavators Union Local 731 Welfare Fund ("Plaintiff") on behalf of Wynn
2    Resorts, Limited ("Wynn Resorts" or the "Company"), derivatively, alleges upon personal
3    knowledge as to itself and its own acts, and upon information and belief as to all other matters,
4    based upon a review of publicly available information, including Securities and Exchange
5    Commission ("SEC") filings by Wynn Resorts, media reports about Wynn Resorts, and Court
6    pleadings concerning Defendants, the following:

7                                    **INTRODUCTION**

8        1.      This is a shareholder derivative action brought by Plaintiff against Wynn Resorts'
9    directors and officers for breaches of their fiduciary duties owed to Wynn Resorts and its
10   shareholders.   Defendants breached their fiduciary duties by causing and/or allowing Wynn
11   Resorts to engage in *ultra vires* acts, waste corporate assets, and allow potential violations of the
12   Foreign Corrupt Practices Act ("FCPA") from at least 2009 to the present (the "Relevant
13   Period").

14       2.      In May 2011, Wynn Resorts, through its affiliate Wynn Macau, Limited ("Wynn
15   Macau") pledged to "donate" an unparalleled $135 million to the University of Macau
16   Development Foundation (the "Foundation") in Macau, People's Republic of China.   The
17   donation was approved by the Board of Wynn Resorts and called for a $25 million payment
18   made in May 2011 and a commitment for additional "donations" of $10 million each year
19   through 2022 – the year that Wynn Resorts' original casino concession agreement in Macau
20   expires.   The $135 million gift was extremely generous, representing some 70% of the
21   Foundation's overall endowment, and appears to be unprecedented in the history of both the
22   University of Macau and Wynn Resorts.  The fact that the Chancellor of the University of Macau
23   is also the head of Macau's government, with ultimate oversight of gaming matters, coupled with
24   the size of the "donation," has aroused suspicion that this was not a charitable gift.  Rather, it
25   was an indirect attempt by the Board to improperly influence the procurement of a casino
26   license.  This suspicion was heightened when, after the donation was made, Wynn Resorts,
27   through its subsidiaries, received an additional land and casino concession from the Macau
28

                                            1

1   government to build and operate another casino in Macau, which would reportedly double Wynn

2   Resorts' billions of dollars of existing revenue.

3           3.      As a result of, among other things, the facts set forth in the foregoing paragraph,

4   Wynn Resorts' $135 million donation has drawn scrutiny from the United States government.

5   On February 8, 2012, Wynn Resorts received a letter from the SEC requesting that, in connection

6   with an informal inquiry by the SEC, it preserve all information relating to the donation to the

7   University of Macau, any donations by it to any other educational charitable institutions,

8   including the University of Macau Development Foundation, and its casino or concession

9   gaming licenses or renewals in Macau.

10          4.      Beyond the donation of $135 million to the University of Macau, Wynn Resorts

11  has admitted in a recently filed litigation that according to its own investigation, Kazuo Okada

12  ("Okada"), its Vice Chairman of the Board, has, for the past several years, used accounts at

13  Wynn Resorts to attempt to allegedly improperly influence gaming regulators in the Philippines

14  for a casino project.  Wynn Resorts describes Okada's activities as *prima facie* violations of the

15  FCPA.  Okada could not, however, have used these accounts without the knowledge and

16  approval of the Board of Wynn Resorts.

17          5.      Conversely, Okada has now accused the Wynn Resorts Board of improprieties

18  and has alleged that the Board breached its fiduciary duties to the Company.  *See Wynn Resorts,*

19  *Limited v. Okada*, Case No. 2:12-cv-00400-LRH-PAL (D. Nev.) (ECF No. 5).  Okada alleges

20  that in addition to Defendants' improper donation to the University of Macau – for which he was

21  the only member of the Wynn Resorts Board to vote against – Defendants have also acted in a

22  manner contrary to the best interests of Wynn Resorts by having the Company engage in a

23  reckless, improper internal investigation of Okada that was designed to:  (1) force Okada out of

24  his role as Vice Chairman of Wynn Resorts; and (2) allow for the forcible redemption of the

25  nearly 20% of common shares in Wynn Resorts controlled by Okada through Aruze USA, Inc.

26  ("Aruze USA") at a substantial 30% discount to its true value.  According to Okada, the Stephen

27  Wynn (sometimes referred to herein as "Mr. Wynn") -controlled Board engaged in this behavior

28

1  to allow Wynn to retain unfettered control of Wynn Resorts, which – following Defendant

2  Stephen Wynn's divorce from his wife, Defendant Elaine Wynn, and the splitting of their assets

3  – was at risk.

4       6.    Okada claims that the purportedly independent investigation, which was

5  conducted by Freeh Sporkin & Sullivan, LLP ("Freeh Sporkin") utilizing Company assets, was a

6  sham, and that he was never given a fair opportunity to defend himself.  Indeed, it is beyond

7  dispute that the investigations findings, contained in Freeh Sporkin's report to the Board (the

8  "Freeh Report"), determined that Okada was "unsuitable" to own shares in Wynn Resorts, and

9  was then used by the Board as a basis to "redeem" Okada's $2.77 billion stake in Wynn Resorts

10  in exchange for a promissory note that will pay Mr. Okada $1.9 billion in 10 years.[1]  The

11  payment is a 30% discount to the market value of his stake, not including the cost of the 10-year

12  waiting period.  The promissory note pays a mere 2% annual interest rate.

13       7.    The buyout of Okada's interest under the aforementioned terms is financially

14  advantageous to Defendants, including Stephen Wynn and Elaine Wynn.  More importantly,

15  however, for Defendant Stephen Wynn and the Board he controls by getting rid of Mr. Okada, it

16  allows him to maintain virtually absolute control over the Company he founded.

17       8.    The redemption is, however, of questionable legality, and will result in the

18  Company needing to spend tens of millions of dollars defending the action in court.  As stated in

19  a February 20, 2012 article in *The Wall Street Journal* after the redemption was announced:

20
21  > Wynn Macau shares initially opened up more than 5%, in part because the buyout of its largest shareholder effectively raised the ownership stake of the company's remaining investors.  Casino consultant and analyst Bill Lerner said in a note the transaction was "highly accretive for Wynn Resorts."  He estimated earnings per share could grow by 15%.  However, he and others cautioned that legal challenges could disrupt that.  The shares were up 3% at midday.

22
23
24

25  [1]    According to an article in *The Wall Street Journal*, Wynn Resorts' bylaws, written in

26  2002, state that people found unsuitable to own shares by the board may have to wait 10 years to be paid back at fair value, with 2% interest per year.  *See Wynn Resorts Accuses Co-Founder of*

27  *Improper Payments*, WALL ST. J., Feb. 19, 2012, http://online.wsj.com/article/BT-CO-20120219-704240.html.

28

1    *See* Alexandra Berzon and Kate O'Keefe, *Board of Wynn Resorts Forcibly Buys Out Founder*,

2    WALL ST. J., Feb. 20, 2012, http://online.wsj.com/article/SB1000142405297020335 8704577233

3    052477385494.html.

4          9.    Notably, the Counterclaim, which was filed on March 12, 2012, by Aruze USA

5    and its parent company, Universal Entertainment Corporation ("Universal"),[2] contains many

6    other allegations that call into question the propriety of the Board's action.  Indeed, in that filing,

7    Aruze USA and Universal allege, among other things, that:

8          • "the Board's vote of redemption is void *ab initio*, because Wynn
                Resorts is barred by contract from redeeming Aruze USA's

9                securities" and "disputes that any redemption has occurred";

10         • "Wynn Resorts undertook a secret investigation, hiding the
                subjects of the investigation from Aruze USA by erroneously

11               invoking attorney-client privilege and confidentiality, even after
                Wynn Resorts had leaked a 'report' of the investigation to *The*

12               *Wall Street Journal*";

13         • Wynn Resorts "refused Aruze USA any reasonable opportunity to
                respond prior to redeeming Aruze USA's interests, despite prior

14               written promises to do so"; and

15         • the redemption would "allow Mr. Wynn and others to profit
                unjustly from their illegal acts and a process that was corrupt and

16               unfair."

17         10.   As a result of the Board's actions, the Company has already suffered, and will

18   continue to suffer, substantial financial damage.  The Company's goodwill and reputation have

19   also been horribly damaged by the Board's actions, and, in addition to having to defend the

20   Aruze USA/Universal Counterclaim, the Company is now threatened with several serious

21   criminal and regulatory investigations, which will almost certainly result in criminal indictments

22   and/or civil enforcement actions, either of which could impair the Company's ability to gain new

23   gaming licenses, or retain those which it currently holds.  In fact, as a direct and proximate result

24   of the Board's actions, on February 27, 2012, the Philippines House Committee on Games and

25

26   [2]      Aruze USA is a Nevada company and a wholly owned subsidiary of Universal.
     Universal (f/k/a Aruze Corp.) is a corporation organized and existing under the laws of Japan.

27   Okada is the Chairman of the Board of Universal.

28

4

1    Amusements approved a motion to ban Wynn Resorts from opening any gaming operations in

2    the Philippines.  The Company's action of donating $135 million further constitutes corporate

3    waste as it appears that the true purpose of the donation was to secure or influence the Macau

4    government into granting, the licenses for Wynn Casinos.

5           11.    Since the Company remains under the control and/or influence of the primary

6    wrongdoers who:  (1) have substantial conflicts; (2) are beholden to Stephen Wynn; and/or

7    (3) may be implicated in the commission of the wrongful conduct alleged herein, Wynn Resorts

8    is unable to protect itself or remedy the wrongs inflicted upon it.  Accordingly, this derivative

9    action must be brought and vigorously prosecuted to protect and vindicate the rights of Wynn

10   Resorts.

11          12.    This action seeks restitution to Wynn Resorts for the *ultra vires* and wasteful acts

12   of improperly paying money to others in contravention to the Wynn Resorts' Code of Business

13   Conduct and Ethics and the FCPA, and for the costs and expenses that have, and will be paid, by

14   the Company as a result of the Defendants' wrongdoing.  This action also seeks to enjoin the

15   future payments of the pledge made to the University of Macau and seeks the implementation of

16   effective corporate governance changes.

17                              **JURISDICTION AND VENUE**

18          13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

19   §1332(a)(2).    Plaintiff and Defendants are citizens of different states and the matter in

20   controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive one

21   to confer jurisdiction on a court of the United States which it would not otherwise have.

22          14.    The Court has personal jurisdiction over each Defendant because each Defendant

23   has committed acts related to the claims at issue in this Complaint within this District.

24          15.    Venue is proper in this district because Nominal Defendant Wynn Resorts,

25   Limited is headquartered in this District and a number of the Individual Defendants are citizens

26   of the State of Nevada.  Additionally, venue is proper in this district because a substantial portion

27

28

5

1    of the transactions and wrongs complained of herein, including the Defendants' primary

2    participation in the wrongful acts detailed herein, occurred in this district.

3                                              **PARTIES**

4    **Plaintiff**

5          16.     Plaintiff Excavators Union Local 731 Welfare Fund is a shareholder of Wynn

6    Resorts and has continuously held its shares since at least June 2010.  Plaintiff is a citizen of

7    New York.

8    **Nominal Defendant**

9          17.     Nominal Defendant Wynn Resorts is a Nevada corporation with its principal

10   place of business in Nevada.  Wynn Resorts is a developer of destination resort casinos.  Wynn

11   Resorts owns resort casinos through its wholly owned subsidiary Wynn Las Vegas, LLC and

12   through Wynn Macau, in which Wynn Resorts owns a majority interest (the remainder being

13   publicly traded on the Hong Kong Stock Exchange).  Wynn Macau operates resort casinos in

14   Macau through its wholly owned subsidiary Wynn Resorts (Macau), S.A.

15   **The Defendants**

16         18.     Defendant Stephen A. Wynn is a founder of Wynn Resorts, a substantial

17   shareholder, and has served as Chairman of the Board and Chief Executive Officer of Wynn

18   Resorts since its creation in 2002.  Stephen Wynn also serves as the Chairman and Chief

19   Executive Officer of Wynn Macau.  Stephen Wynn is the former husband of Defendant Elaine P.

20   Wynn.  Defendant Stephen Wynn is a citizen of Nevada.

21         19.     Defendant Linda Chen has served as a director of Wynn Resorts since October

22   2007.  She has served as the President of Wynn International Marketing, Limited, a wholly

23   owned indirect subsidiary of Wynn Resorts, since January 2005.  She has also served as the

24   Chief Operating Officer of Wynn Resorts (Macau), S.A. since June 2002.  She is a member of

25   the Board of Directors of Wynn Macau.  Defendant Chen is a citizen of Macau.

26         20.     Defendant Russell Goldsmith has served as a director of Wynn Resorts since

27   being appointed to the Board in May 2008.  Goldsmith currently serves as a member of the

28

                                                  6

Company's Audit and Compensation Committees and is designated as an audit committee financial expert as defined in the Securities Exchange Act of 1934. Defendant Goldsmith is a citizen of California.

21.     Defendant Ray R. Irani has served as a director of the Company since October 2007. Irani currently serves as a member of the Company's Compensation and Nominating and Corporate Governance Committees. Defendant Irani is a citizen of California.

22.     Defendant Robert J. Miller has served as a director of Wynn Resorts since October 2002.  Miller currently serves as a member of the Company's Compliance and Nominating and Corporate Governance Committees. Defendant Miller is a citizen of Nevada.

23.     Defendant John A. Moran has served as a director of Wynn Resorts since October 2002.  During the Relevant Period, he served on the Board's Nominating and Corporate Governance Committee. Defendant Moran is a citizen of Florida.

24.     Defendant Kazuo Okada is a founder of Wynn Resorts, and was, until recently, its largest shareholder, and has served on its Board since October 2002. Defendant Okada is a citizen of Hong Kong.

25.     Defendant Marc D. Schorr has served as Chief Operating Officer of Wynn Resorts since June 2002 and as a director of Wynn Resorts since 2010. Schorr has served as a non-executive Director of Wynn Macau, Limited since September 2009 and is also an officer of several of the Company's other subsidiaries. Defendant Schorr is a citizen of Nevada.

26.     Defendant Alvin V. Shoemaker has served as a director of Wynn Resorts since December 2002.  Shoemaker currently serves as a member of the Audit and Compensation Committees and is designated as an audit committee financial expert as defined in the Securities Exchange Act of 1934. Defendant Shoemaker is a citizen of New Jersey.

27.     Defendant D. Boone Wayson has served as a director of Wynn Resorts since August 2003.  Wayson is currently a member of the Company's Audit and Compensation Committees and is designated as an audit committee financial expert as defined in the Securities Exchange Act of 1934. Defendant Wayson is a citizen of Maryland.

7

28.     Defendant Elaine P. Wynn, the former wife of Stephen Wynn, has served as a director of Wynn Resorts since October 2002. Defendant Elaine Wynn is a citizen of Nevada.

29.     Defendant Allen Zeman has served as a director of Wynn Resorts since October 2002. Zeman is currently a member of the Company's audit committee and is designated as an audit committee financial expert as defined in the Securities Exchange Act of 1934. He is also Vice Chairman and a member of the Board of Directors of Wynn Macau. Defendant Zeman is a citizen of Hong Kong.

30.     The present membership of the Audit, Compliance, and Nominating and Governance committees is:

| Director | Audit (*Denotes Financial Expert) | Compliance | Nominating and Governance |
|---|---|---|---|
| Goldsmith | ✓* | | |
| Irani | | | ✓ |
| Miller | | Chairperson | Chairperson |
| Moran | | | ✓ |
| Shoemaker | ✓* | | |
| Schorr | | ✓ | |
| Wayson | Chairperson* | | |
| Zeman | ✓* | | ✓ |

31.     According to Wynn Resorts' 2011 proxy statement, the membership of the Audit, Compliance, and Nominating and Governance committees was:

| Director | Audit (*Denotes Financial Expert) | Compliance | Nominating and Governance |
|---|---|---|---|
| Goldsmith | ✓* | | |

8

| Director | Audit<br>(*Denotes Financial Expert) | Compliance | Nominating and Governance |
|---|---|---|---|
| Irani | | | ✓ |
| Miller | | Chairperson | Chairperson |
| Moran | | | ✓ |
| Shoemaker | ✓* | | |
| Schorr | | ✓ | |
| Wayson | Chairperson* | | |
| Zeman | ✓* | | ✓ |

32.    According to Wynn Resorts' 2010 proxy statement, the membership of the Audit, Compliance, and Nominating and Governance Committees was:

| Director | Audit<br>(*Denotes Financial Expert) | Compliance | Nominating and Governance |
|---|---|---|---|
| Goldsmith | ✓* | | |
| Irani | | | ✓ |
| Miller | | Chairperson | Chairperson |
| Moran | ✓ | | |
| Shoemaker | Chairperson* | | |
| Schorr | | ✓ | |
| Wayson | ✓* | | ✓ |
| Zeman | ✓* | | ✓ |

33.    According to Wynn Resorts' 2009 proxy statement, the membership of the Audit, Compliance, and Nominating and Governance committees was:

9

| Director | Audit<br>(*Denotes Financial Expert) | Compliance | Nominating and Governance |
|---|---|---|---|
| Goldsmith | ✓* | | |
| Irani | | | ✓ |
| Miller | | Chairperson | Chairperson |
| Moran | ✓ | | |
| Shoemaker | Chairperson* | | |
| Schorr | | ✓ | |
| Wayson | ✓* | | ✓ |
| Zeman | ✓* | | ✓ |

## CONDUCT ALLEGATIONS

**A.    Stephen Wynn, the Founding of Wynn Resorts and the Reason He Fears Losing Control**

34.    Stephen Wynn is a legendary Las Vegas casino operator.  Mr. Wynn developed Mirage Resorts, Inc., a casino conglomerate that owned Treasure Island, and transformed the Las Vegas Strip with the Mirage and Bellagio casinos.  On May 31, 2000, MGM Grand Inc. merged with Mirage Resorts, Inc.  In June 2000, after a bruising boardroom battle, which centered on allegations that Mr. Wynn misappropriated company funds, MGM Grand, Inc. ousted Mr. Wynn as Chief Executive Officer of Mirage Resorts.  Such is Mr. Wynn's renown, that one newspaper reported his demise with the headline: "The King is Dead."[3]

35.    Humiliated by his public ouster, Mr. Wynn was anxious to re-enter the casino business and rebuild his reputation and standing in Las Vegas.  He purchased the old Desert Inn casino and had plans to build a new casino on the site.  It was to be named the "Wynn."  Mr. Wynn lacked the capital to fund the development of the casino, so he undertook an extensive

---

[3]    Alexandra Berzon, Yoree Koh, and Kate O'Keeffe, *The Unraveling of a Casino Marriage*, WALL ST. J., Mar. 12, 2012, http://online.wsj.com/article/SB10001424052 70230445000457727549098520945O.html.

10

1    search for investors. However, having recently been forced out of Mirage Resorts, Inc., he was

2    shunned by other sources of capital. Mr. Wynn eventually called on Mr. Okada.

3           36.     Mr. Okada was, and is, a highly successful Japanese entrepreneur and himself a

4    pioneer in the gaming industry. After leaving high school, Mr. Okada attended an electronics

5    trade school. In 1969, Mr. Okada founded Universal Lease Co. Ltd., which is now Universal.

6    Mr. Okada became a leader in the businesses of pachinko. In addition, Mr. Okada founded a

7    company that created one of the first video poker machines. In fact, Mr. Wynn originally met

8    Mr. Okada when one of Mr. Okada's affiliated companies, Aruze Gaming America, was selling

9    electronic gaming machines in Nevada.

10           37.     Although they have very different backgrounds and educational experiences, both

11    Mr. Wynn and Mr. Okada are of similar ages, interests, and ambitions. Beyond their business

12    dealings, Mr. Wynn gave every indication that he considered Mr. Okada to be a close personal

13    friend, and repeatedly called him his "partner."

14           38.     For example, at hearings before the Nevada State Gaming Control Board and

15    Nevada Gaming Commission, on June 4 and 17, 2004, respectively, Mr. Wynn affirmed that

16    "Mr. Okada was not only suitable" to receive a gaming license "but he was desirable."

17    Repeatedly referring to Mr. Okada as his "partner," Mr. Wynn said Mr. Okada was "dedicated to

18    the pursuit of excellence."

19           39.     In this sworn testimony, Mr. Wynn also affirmed Mr. Okada's generosity, and his

20    unwavering trust in Mr. Wynn. Mr. Wynn said "I have never dreamed that there would be a man

21    as supportive, as long-term thinking, as selfless in his investment as Mr. Okada." Mr. Wynn

22    recalled a conversation with Mr. Okada on a plane from Macau to Tokyo: Mr. Okada "told me

23    the most important thing, Steve ... is the right thing. Take the high road. Do the right thing.

24    Don't worry about me. I'll support any decision you may make."

25           40.     Beginning in November 2000, Mr. Wynn used a Nevada limited liability

26    company called Valvino Lamore, LLC ("Valvino") as the holding entity for his new Desert Inn

27    casino project. After in-person discussions between Mr. Wynn and Mr. Okada, Aruze USA

28

made a contribution of $260 million in cash to Valvino in exchange for 50% of the membership interests in Valvino, effective November 30, 2000.  This contribution was the seed capital that allowed for the development of what is now Wynn Resorts.

41.   In April 2002, Aruze USA made two additional contributions totaling $120 million to Valvino.

42.   On September 28, 2002, Mr. Wynn contributed the LLC interests in Valvino to Wynn Resorts.   Thereafter, on October 21, 2002, Mr. Okada became a member of Wynn Resorts' Board.

43.   On October 25, 2002, Wynn Resorts conducted an initial public offering ("IPO") on NASDAQ at $13 per share.  At this time, Mr. Okada and Mr. Wynn each owned about 30% of the outstanding stock.  Shortly thereafter, Mr. Okada became Vice Chairman of the Wynn Resorts' Board.

44.   On April 28, 2005, Wynn Las Vegas opened.  It was an instant success.  On September 8, 2006, Wynn Resorts opened in Macau. "Encore" hotels followed in both locations and, like the other Wynn properties, they were a success.

**B.     Stephen and Elaine Wynn Divorce and Mr. Okada Becomes Wynn Resorts' Largest Shareholder**

45.   In March 2009, Mr. Wynn divorced Elaine Wynn.  The divorce proved to be damaging to Mr. Wynn's financial position and standing within Wynn Resorts.  By early 2010, Mr. Wynn had reached an agreement to split his ownership of Wynn Resorts stock with Elaine Wynn.  As a result of the divorce settlement, Aruze USA was now, by far, Wynn Resorts' largest stockholder, owning some 24,549,222 shares of Wynn Resorts, or 19.66% of the outstanding stock.  Mr. Wynn would now own less than half of what Aruze USA owned of Wynn Resorts stock.  While neither Aruze USA nor Mr. Okada ever made any threats against Mr. Wynn, the possibility loomed that Mr. Wynn could lose control of Wynn Resorts, as had happened ten years earlier when Mr. Wynn lost control of Mirage Resorts, Inc.

46.     On January 6, 2010, Mr. Wynn obtained an Amended and Restated Stockholders Agreement.  The amended agreement altered the Stockholders Agreement language regarding Aruze USA's right to nominate directors.  Aruze USA could endorse nominees so long as the majority of nominees were endorsed by Mr. Wynn.  Although the agreement required Mr. Wynn to support a minority slate of directors proposed by Aruze USA, he never did so.  In fact, the Counterclaim alleges that Mr. Wynn consistently refused efforts to consider Aruze USA nominated directors for the Board in an effort to continue to monopolize control over Wynn Resorts.

47.     In addition, the Amended and Restated Stockholders Agreement continued to contain a non-compete clause that prohibited Mr. Okada, Aruze USA, and Universal from operating casinos in only Clark County, Nevada and in Macau, and certain Internet gaming ventures.  On information and belief, neither this version of the Stockholders Agreement, nor any prior or subsequent agreements, contained any prohibition or concerns regarding the Philippines or Korea.

**C.     The University of Macau "Donation"**

48.     The government of Macau owns most of the land in Macau.  Macau is a special administrative region of the People's Republic of China, although it operates with its own autonomous government.  In most cases, private interests in real property located in Macau are obtained through long-term leases and other grants of rights to use land from the government. The Macau government has authority over Wynn Macau's current gaming concessions and the ability to grant future concessions necessary for Wynn Resorts to either continue to operate in Macau or to expand its operations in Macau.

49.     In Macau, Wynn Resorts operates Wynn Macau Encore under a 20-year casino concession granted by the Macau government in June 2002.  Currently, the Macau operations include approximately 265,000 square feet of casino space and two luxury hotel towers with 1,008 rooms and suites.  Wynn Resorts' Macau operations provide it with a substantial majority of its net revenues.  The Macau operations provided about $3.79 billion of net revenue for 2011.

13

1    In comparison, its Las Vegas operations provided it with about $1.48 billion in net revenues for

2    2011.

3        50.    Macau is undeniably important to both Wynn Resorts' current and future

4    prospects.  According to industry reports, Macau is now the gambling capital of the world and

5    revenue from gambling operations in Macau is expected to grow 35% to $32 billion.[4]  Wynn

6    Resorts has, for some time, planned to open another casino resort on 51 acres of land in the Cotai

7    area of Macau in late 2014 or early 2015.  In February 2011, Defendant Stephen Wynn indicated

8    the budget for the Cotai project could be as much as $2.5 billion.  At the same time, he stated

9    that Wynn Resorts needed the Chinese government's (Macau) permission to begin construction

10   on the Cotai project.

11       51.    The University of Macau was founded in 1981 as private university, known then

12   as the University of East Asia.  In 1991, the University of East Asia was taken over by the

13   Macau government and renamed the University of Macau.  It describes itself as the largest and

14   leading university in Macao.  Notably, the Chancellor of the University of Macau is also the head

15   of Macau's government, with ultimate oversight of gaming matters.  In 2009, the University of

16   Macau Development Foundation was founded to help grow the University of Macau.

17       52.    In May 2011, in a near unanimous vote of the Board of Directors for both Wynn

18   Resorts and Wynn Macau, with only Okada objecting to the vote, Wynn Macau pledged $135

19   million to the University of Macau Development Foundation in support of the new Asia-Pacific

20   Academy of Economics and Management.  The donation consists of a $25 million payment

21   made in May 2011 and a commitment for additional donations of $10 million each year for the

22   calendar years 2012 through 2022 inclusive.  The $135 million gift was extremely generous,

23   representing some 70% of the Foundation's overall endowment.  The donation appears to be

24   unprecedented in the history of both the University of Macau and Wynn Resorts.  Suspiciously,

25   Wynn Macau's casino concession agreement in Macau expires in 2022 – the year of the last

---

26   [4]    Kelvin Wong, *Macao Gets a New $1.9b Casino*, CHINA DAILY, May 16, 2011,
27   http://www.chinadaily.com.cn/bizchina/2011-05/16/content_12518157.htm.

28

1   payment of the pledge.  Wynn Macau and Wynn Resorts have also disclosed that Wynn Macau

2   is in the process of seeking to obtain land in Macau and the rights to develop another casino in

3   the area.

4        53.   The pledge to the University of Macau Development Foundation was considered

5   and approved not only by Wynn Macau's Board, but by Wynn Resorts' Board.  Each of the

6   Defendants, excepting Mr. Okada, voted to approve the pledge and commit Wynn Resorts'

7   assets.

8        54.   According to the Counterclaim filed by Aruze USA and Universal:

9        Mr. Okada objected to the unprecedented size and duration of the
commitment.  It was unclear how the University of Macau would use the
10  funds.   Mr. Okada wondered why a wealthy university that sits on
government land and largely caters to non-Macau residents might need or
11  want such a large donation.  Mr. Okada, who is himself a significant
philanthropist, wondered whether such a donation actually benefits the
12  people who live in Macau.   He was concerned about the lack of
deliberation of the boards of Wynn Resorts and Wynn Macau (the
13  donation was approved at a joint meeting in Macau of the two boards), and
that pending approvals in Macau related to a new development in Cotai,
14  and the coincidence of the date of the donation and the term of Wynn
Macau's gaming license in Macau, might make it appear that Wynn
15  Macau and Wynn Resorts were paying for benefits.

16       55.   The counterclaim further alleges that:

17       While Wynn Resorts claims to have received a legal opinion sanctioning
the unprecedented donation, ***Wynn Resorts did not provide that legal***
18  ***opinion to Mr. Okada*** or, on information and belief, to any other members
of the board of either Wynn Macau or Wynn Resorts.  On information and
19  belief, Mr. Wynn – and potentially others – misled the Wynn Resorts'
Board by securing its consent to the donation, without disclosing his
20  personal knowledge of the close connection between University of Macau
and officials responsible for regulatory decisions related to Wynn Macau's
21  gaming operations.

    [Emphasis added.]

22       56.   It should also be noted that the Company's donation to the University of Macau

23  was not the first such gift lavished on the Macau government.  In December 2006, Wynn Macau

24  donated an early Ming dynasty vase to the Macau Museum.  The vase was purchased with Wynn

25  Macau funds on May 2006 for approximately $10.1 million.  The $10.1 million expense for the

26  donation of the Ming vase is included in financial filings with the SEC under the category

27  "Property charges and other" for the year ended December 31, 2006.

28

57.     After the University of Macau donation was made, on September 9, 2011 Wynn Macau announced, that its subsidiaries, Palo Real Estate Company Limited ("Palo") and Wynn Resorts (Macau) S.A., formally accepted the terms and conditions of a land concession contract from the Macau government regarding approximately 51 acres of land in the Cotai area of Macau.  The concession permits Palo and Wynn Macau to develop a resort containing a five-star hotel, gaming areas, retail, entertainment, food and beverage, spa and convention offerings on the Cotai land.  Wynn Resorts anticipated the project will consist of over 2,000 hotel rooms and suites.  In December 2011, Wynn paid the initial deposit of $62.5 million pursuant to this draft land concession contract.

58.     On January 11, 2012, Defendant Okada filed a civil complaint against Wynn Resorts in the District Court of Clark County, Nevada (No. A-12-654522-B) seeking the Company's books and records for inspection by his counsel.  Among other things, Defendant Okada's complaint questions the propriety of Wynn Resorts' donations to the University of Macau Development Foundation.

59.     On February 8, 2012, following Mr. Okada's lawsuit, Wynn Resorts received a letter from the SEC stating that the Division of Enforcement of the SEC has commenced an "informal inquiry" regarding matters in Macau and requesting that the Company preserve information relating to the donation to the University of Macau and any other charitable organizations.  The letter also requested the preservation of information related to the Company's Macau gaming licenses.

60.     Regardless of who ultimately prevails in the Wynn Resorts boardroom battle, it is the Company that has, and will, lose the most.  Allegations of corruption are particularly damaging in the highly regulated casino industry, and the Company may be particularly vulnerable since the accusations are being made at a time when U.S. regulators are pursuing a record-breaking number of anti-corruption investigations.  Moreover, in addition to the high cost of defending against an FCPA investigation and/or prosecution, the Company's ability to maintain current, and secure future, gaming licenses has been jeopardized.

**D.**   **The Wynn and Okada Relationship Deteriorates, the Investigation, the Ousting of Okada, and the Redemption of Okada's Wynn Resorts Stock**

61.   In or around 2006, Mr. Okada was suffering financial setbacks and as a result was seeking to sell shares in Aruze. As set forth above, Aruze held the shares of Wynn Resorts owned by Mr. Okada. According to *The Wall Street Journal*, Mr. Wynn feared his control over Wynn Resorts could be threatened if Mr. Okada sold shares in Wynn Resorts or lost control of Aruze.[5] "Mr. Wynn asked Mr. Okada to sign an amendment to their shareholders agreement that provided Messrs. Wynn and Okada couldn't sell shares in Wynn without the other's consent. In return, Mr. Wynn promised a dividend to Mr. Okada." *Id.*

62.   "The agreement was signed in 'the spirit of friendship and cooperation,' the amendment stated. 'We want to make it clear we're one shareholder,' Mr. Wynn said at the time." *Id.*

63.   "The agreement coincided with the Company's first dividend, which yielded around $147 million for Aruze USA. Wynn Resorts said the dividend was paid because the Company was flush with cash, and was unrelated to any agreement between Messrs. Wynn and Okada." *Id.*

64.   "Mr. Okada needed funds because he had decided in the summer of 2007 to develop casinos himself in Asia . . . which was becoming the world's gambling center." *Id.*

65.   "In August 2008, Mr. Okada's company received one of four casino licenses issued by the Philippines government and spent approximately $300 million for a waterfront piece of land in Manila. He needed to raise money for the project, which was estimated to cost around $2 billion." *Id.*

---

[5]   Alexandra Berzon, Yoree Koh, and Kate O'Keeffe, *The Unraveling of a Casino Marriage*, WALL ST. J., Mar. 12, 2012, http://online.wsj.com/article/SB10001424052702304450004577275490985209450.html.

66.   "Mr. Okada proposed that he and Mr. Wynn work together on the casino. But Mr. Wynn tried to persuade him to quit the Philippines – a new frontier for international casino operators – and instead allow Wynn Resorts to lead projects elsewhere." *Id.*

67.   Raising cash for the project proved difficult for Mr. Okada.   According to *The Wall Street Journal*, lenders sought Mr. Okada's stake in Wynn Resorts as collateral, but that wasn't allowed by the new shareholders agreement entered into by Wynn and Okada. *Id.*

68.   The article further stated that "Mr. Wynn refused several requests to change the agreement. . . . Instead, in early 2009, Mr. Wynn extended to Mr. Okada's company a personal loan of around $60 million.  Mr. Okada reportedly repaid the loan within a year."   Thereafter, Mr. Okada, "previously known for being silent in board meetings, [] began to question Wynn Resorts' financial strategy and to press the Company to expand into the Philippines." *Id.*

69.   A relationship that was going bad was soon to get worse.  According to Company filings, as part of his divorce settlement, Stephen Wynn gave half of his Wynn Resorts shares to his ex-wife in January 2010.  This left Mr. Okada as the Company's largest shareholder.  "Mr. Okada [again] asked Mr. Wynn to work with him in Asia and to allow him more control in the Company."  To this end, "in April 2010, Mr. Wynn agreed to meet Japan's finance minister to talk about legalizing casinos, which Mr. Okada had asked him to do.  Mr. Wynn, however, missed the meeting after failing to get landing rights for his plane."  According to an email from Mr. Okada to Mr. Wynn reviewed by *The Wall Street Journal,* Mr. Okada felt betrayed and embarrassed.  "I humiliated myself to the finance minister," Mr. Okada wrote. *Id.*

70.   "In an email dated July 7, 2010, a deputy of Mr. Okada's wrote to Mr. Wynn reminding him that Mr. Okada was the Company's largest shareholder, yet he wasn't kept abreast of 'actual activities and future plans of Wynn Resorts.'  Moreover, according to the email, Mr. Okada wanted the authority to nominate board members." *Id.*

71.   "Mr. Okada kept trying to persuade Mr. Wynn to join the Philippines project, and he set up a meeting between Mr. Wynn and the country's president." *Id.*

18

72.     In February 2011, Wynn Resorts' Board of Directors ordered the Company not to invest in Mr. Okada's Philippines project, and asked Mr. Wynn to cancel the visit with the president. According to news reports, the Board's decision was based on "an independent study the Company had commissioned that said corruption was 'deeply ingrained' in the Philippines gambling industry." The study also purportedly "raised questions about the conduct of people working in the Philippines on behalf of Mr. Okada." *Id.* Mr. Okada alleged that the Board did not inform him of the report.

73.     In May 2011, the Wynn Board approved the University of Macau Development Foundation "donation" over Mr. Okada's objections.

74.     According to *The Wall Street Journal*, in August 2011, Wynn Resorts began a second covert investigation into Mr. Okada's activities in the Philippines. *Id.*

75.     "On September 30, 2011, two attorneys from Wynn Resorts [the "Wynn Attorneys"] presented Mr. Okada's attorney with the Board's corruption concerns from its investigation and said that because Mr. Okada's casino in the Philippines may compete with Wynn's businesses, he was violating his fiduciary duties as a board member." *Id.*

76.     According to the Counterclaim filed by Aruze USA and Universal, the Wynn Attorneys also proposed to change the Shareholders Agreement to allow Aruze USA to sell or pledge shares, ***but subject to a voting trust, which would allow Mr. Wynn to vote the shares, and a right of first refusal for Mr. Wynn to purchase the shares***. Such a proposal is plainly improper and a breach of fiduciary duty, as the Wynn Attorneys were advocating for Mr. Wynn, not for Wynn Resorts.

77.     The Counterclaim further provides that one of the Wynn Attorneys then stated that the Compliance Committee would meet on October 31, 2011 (in advance of a November 1 Board meeting). That same attorney told Mr. Okada that she hoped a "resolution" would be reached before those meetings regarding Mr. Okada's directorship and the voting rights of Aruze USA's stock, so as to avoid presenting this matter to the Compliance Committee and the Board.

19

1   In other words, Wynn Resorts' compliance procedures were being used to extract a personal

2   benefit for Mr. Wynn.

3       78.    "A few days later, Messrs. Wynn and Okada, [accompanied] by their lawyers, met

4   together in Las Vegas.  Mr. Wynn [reportedly] accused Mr. Okada of using the Company's

5   intellectual property and misrepresenting his project, including handing out his Wynn Resorts

6   business cards. . . . He also raised corruption concerns connected to Mr. Okada's Philippines

7   project.  Mr. Wynn told Mr. Okada he should step down from his role as a director."  *See*

8   Berzon, *supra* note 6.

9       79.    According to the Aruze Counterclaim:

10
11       On an October 3, 2011 telephone call, Aruze USA's counsel asked [one of
    the Wynn Resorts' Attorneys] to provide Aruze USA with a copy of the

12       Compliance Committee's investigative report regarding Mr. Okada.  [The
    Wynn Resorts' Attorney] replied that she would have to check to see if a
    copy could be provided; in fact, she did not and has never provided a copy

13       of the investigative report to Aruze USA, Mr. Okuda, or their counsel.

14
                             *  *  *

15
16       On October 4, 2011, Mr. Wynn and [one of the Wynn Resorts' Attorneys]
    met with Mr. Okada and his counsel.  At the meeting, Mr. Wynn stated

17       that of Wynn Resorts' other directors had already decided that Mr. Okada
    must be removed as Vice Chairman of the Company's Board and as a

18       director of both the Wynn Macau and Wynn Resorts Boards.  It apparently
    did not matter to Mr. Wynn and [one of the Wynn Resorts' Attorney] that

19       in Nevada only *stockholders can remove directors*.  Based on a false
    threat, Mr. Wynn demanded Mr. Okada's resignation as a director.

20
21                                *  *  *

22       Mr. Okada's counsel told Mr. Wynn that, in all his years, he had never
    before experienced a situation where the subject of an investigative report

23       had never been formally questioned or even permitted to respond to the
    accusations being levied against him.  Mr. Okada's counsel once again

24       requested a copy of the investigative report so that he and Mr. Okada's
    other attorneys could ensure they were advising Mr. Okada properly and

25       that the Wynn Directors could make a decision based on accurate
    information.  Over the course of the remainder of the October 4 meeting,

26       counsel for Mr. Okada asked at least two additional times for a copy of the

27       investigative report.  [One of the Wynn Resorts' Attorneys] finally replied
    that Mr. Okada and his counsel could not see a copy of the investigative

28

report because it was "privileged."  On information and belief, [the Wynn Resorts' Attorney] once again intentionally misrepresented the law (Mr. Okada, as a director of the Company, has a right to see the Company's books and records, including its communications with counsel), in breach of her duties to Wynn Resorts.

[Emphasis added.]

80.     On or about October 29, 2011, Wynn Resorts' Compliance Committee hired Freeh Sporkin to investigate Mr. Okada, the casino company's biggest shareholder, with respect to his activities in the Philippines.

81.     At the Board's November 1, 2011 meeting, Defendant Miller presented a report of an alleged investigation by the Compliance Committee into Mr. Okada's and Universal's activities in the Philippines.  The report disclosed that the Compliance Committee had allegedly conducted one internal and two "independent" investigations into allegations of suitability, conflicts of interest, and possible breaches of fiduciary duties related to acquisition of land for the Philippine project and charitable contributions made by Universal.  According to the Counterclaim, the contents of these purported investigations have not been presented to Mr. Okada.

82.     The Counterclaim also alleges that Defendant Miller reported that the Compliance Committee (and not a committee consisting of the independent directors) had retained Freeh Sporkin as a special investigator to conduct an investigation into the allegations against Mr. Okada.   The Board, without debate, deliberation, or allowing Mr. Okada a chance to respond, summarily eliminated Mr. Okada's position as Vice-Chairman of Board and ratified the decision to hire Freeh Sporkin.

83.     On January 12, 2012, Mr. Okada sued Wynn Resorts in a Nevada court, claiming, among other things, that he was blocked from seeing the Company's financial records after he contested Wynn Macau's $135 million pledge to the University of Macau Development Foundation. *See Okada v. Wynn Resorts, Ltd.*, Case No.: A-12-65422-B, Department XI (the "Okada lawsuit").

84.    According to the Counterclaim, "on January 18, 2012, pursuant to Section 2(a) of the Wynn Resorts' Stockholders Agreement, Aruze USA submitted a letter to the Nominating and Corporate Governance Committee of the Company designating three individuals as candidates to be considered for nomination as directors of the Company and included in the Company's proxy statement relating to the Company's 2012 annual meeting of the stockholders or any stockholder meeting held for the purpose of electing Class I directors.  Despite numerous written requests to Mr. Wynn to endorse the slate of directors nominated by Aruze USA, as required by the Stockholders Agreement, Mr. Wynn refused to do so."

85.    On January 27, 2012, Wynn Resorts sought to dismiss the Okada lawsuit, claiming it contained claims that are "innuendo, hyperbole, half-truths and sweeping generalizations."

86.    On February 8, 2012, Wynn Resorts received a letter from the SEC that it is investigating the Company's Macau donations and its casino license in the Chinese territory.

87.    At a hearing on February 9, 2012, the Nevada state court hearing the Okada lawsuit held that Mr. Okada has the right to "reasonable" access to internal company documents.

88.    On February 15, 2012, Wynn Resorts noticed a special meeting of its Board.  The meeting was set for Saturday, February 18, 2012, at 9:00 a.m. in Las Vegas, which is 2:00 a.m. Sunday morning in Japan.  Included on the agenda was a review of the Freeh Report.

89.    According to the Counterclaim, prior to the special meeting of the Board, Mr. Wynn communicated to Aruze USA through intermediaries that, instead of having the Board consider the Freeh Report, Mr. Wynn would be willing to buy Aruze USA's stock for his benefit at a significant discount.    A sale to Mr. Wynn was presented as an alternative to the embarrassment and regulatory issues attendant to possible disclosure of the Freeh Report.

90.    The Counterclaim therefore sets forth yet another breach of fiduciary duty by Mr. Wynn and the Defendants.

91.    According to the Counterclaim the following events took place prior to, and at, the special meeting of the Board:

On February 17, 2012, Mr. Okada's counsel contacted Wynn Resorts' representatives to express Mr. Okada's concerns with the substantive and procedural process for the Company's investigation, and stated that any discussion of unsuitability or redemption, including any discussion involving the Freeh Sporkin report at the February 18 Board meeting, would be premature.

* * *

Rather than addressing the substantive and procedural issues raised by Mr. Okada and his counsel, Wynn Resorts responded briefly, informing Mr. Okada's counsel that additional accommodations would not be made to facilitate translation to enable Mr. Okada's participation by teleconference. The Company also informed Mr. Okada's counsel that, despite the seriousness of the accusations against him, Mr. Okada was not permitted to have counsel present for the Board call.

* * *

When it came time for the meeting, at 2:00 a.m. on Sunday morning, Mr. Okada sat ready to participate by telephone. Mr. Wynn yelled at Mr. Okada's counsel when he introduced himself. Mr. Wynn also said that Mr. Okada's counsel could not be present to advise Mr. Okada even though counsel made clear that he would not address the meeting. (At the threat of having Mr. Okada's telephone connection to the meeting severed, Mr. Okada's counsel had to sit outside the room while the meeting went on, despite Wynn Resorts having a battery of lawyers from multiple law firms present on its end of the line.) Mr. Wynn and a company lawyer informed Mr. Okada that – despite prior assurances that Mr. Okada would receive a copy of the Freeh Sporkin report along with the other directors – he would not receive a copy of the report unless both he and his legal counsel signed a nondisclosure agreement. The nondisclosure agreement would have arguably precluded Mr. Okada from using the report in legal proceedings. Mr. Okada did not sign the nondisclosure agreement.

* * *

As alleged in detail below, a few hours after demanding that Mr. Okada sign the nondisclosure agreement claiming confidentiality, Wynn Resorts would leak a copy of the Freeh Sporkin report to the *Wall Street Journal* and would itself attach a copy to its Complaint in this action.

* * *

There were numerous translation problems during the Board meeting. Mr. Wynn provided a translator who was woefully unable to perform an accurate simultaneous translation. Mr. Okada requested that the translation be provided sequentially (with each speaker and the translator speaking in turn) rather than simultaneously (with the translator speaking at the same time as the speaker at the meeting), but this request was denied. As a result, Mr. Okada could not follow or participate in the proceedings.

\* \* \*

In this way, Mr. Okada sat and listened while Mr. Freeh made a presentation in English that Mr. Okada could not understand. After Mr. Freeh completed his presentation, the Board asked if Mr. Okada had any questions. Mr. Okada stated that he could not understand the presentation, and that he would be able to address the claims of the report only after receiving a copy and discussing with counsel. Mr. Okada also asked the Board to delay making any resolutions until he could respond to the Freeh Sporkin report.

\* \* \*

At some point, someone at Wynn Resorts hung up the telephone, cutting Mr. Okada off from the meeting. Mr. Okada waited to be reconnected, staying up until the sun rose in Asia, all the while not knowing whether the Board had resolved anything following the presentation by Mr. Freeh. [Wynn's General Counsel] later claimed that cutting off the telephone connection to Mr. Okada was a "misunderstanding." No other contact was made with Mr. Okada.

\* \* \*

At 4:45 am ET on February 19, 2012, Aruze USA's counsel received correspondence, containing a notice of determination of unsuitability and a purported redemption notice. In the redemption notice, the Company stated that it would redeem Aruze USA's stock for a note of approximately $1.936 billion, a discount of exactly 30% off the value measured by the stock market's valuation of the stock based on the prior day's closing price.

\* \* \*

Although Wynn Resorts had claimed the Freeh Sporkin report was confidential and tried to extract a signature from both Mr. Okada and his legal counsel in order to see the report prior to redemption, a copy of the report was leaked to the *Wall Street Journal* in the early morning Eastern

24

1    Time of February 19, 2012.  Almost immediately, reports appeared on the *Wall Street Journal* website regarding the contents of the report.

2    92.    On February 19, 2012, at 2:14 a.m. PT, Wynn Resorts filed a complaint in the

3    District Court of Clark County, Nevada (No. A-12-656710-B) against Defendant Okada, Aruze

4    USA, and Universal Entertainment, alleging breaches of fiduciary duty and related claims (the

5    "Wynn Resorts' lawsuit").  The complaint alleged, *inter alia*:

6         Forsaking his obligations to maintain integrity required of a gaming license, the
7         Company's Code of Conduct and his other fiduciary duties, Okada committed
          improper acts that included making payments for the benefit of foreign gaming
8         officials who could advance his personal business interests.  He has furthermore
          elected to compete against Wynn Resorts, undertaking a campaign to convert
9         Wynn Resorts' assets for his own benefit, and that of his affiliates.   Wynn
10        Resorts' has been compelled to defend against Okada's acts of aggression by,
          among other things, the initiation of remedial and defensive Board actions and the
11        prosecution of this action.

12   The complaint included as an exhibit the Freeh Report (without exhibits).

13   93.    The Freeh Report contends that substantial evidence exists that Mr. Okada and his

14   associates made gifts and payments to the two chief gaming regulators of the Philippines

15   Amusement and Gaming Corporation in an amount exceeding $100,000.  This includes a stay at

16   the Wynn Macau in one of the Encore Luxury Villas, with a nightly rate of $6,000 and have,

17   among other luxuries, three master bedrooms and a private casino.[6]

18   94.    The Freeh Report further states that these payments "appear to be prima facie

19   violations of the United States Foreign Corrupt Practices Act."  It also alleges a number of other

20   misdeeds by Mr. Okada in connection with the Philippine casino, including an allegation that

21   Mr. Okada circumvented a Philippine law that requires that gaming operations be 60% owned by

22   Philippine nationals.

23   95.    On February 21, 2012, the Company redeemed 24,549,222 shares of the

24   Company's common stock held by Aruze USA, Inc. as of February 18, 2012.  Wynn Resorts

25

26   [6]    Michael J. De La Merced, *The Wynn fight and the $6,000-a-Night 'High Rollers' Suite*,
     N.Y. Times, Feb. 23, 2012, http://dealbook.nytimes.com/2012/02/23/the-wynn-fight-and-the-
27   6000-a-night-high-rollers-suite/?scp=3&sq=wynn&st=cse.

28

1  "redeemed" Okada's 24,549,222 shares of WYNN, valued at $2.77 billion, in exchange for a

2  promise to pay Okada $1.9 billion in 10 years.  The payment is a 30% discount to the market

3  value of his stake, not including the cost of the 10-year waiting period.  The promissory note

4  pays 2% annual interest.

5      96.   On February 24, 2012, Wynn Macau, Limited issued a press release announcing

6  that its Board of Directors had removed Mr. Kazuo Okada from the Board.

7      97.   On February 27, 2012, the Philippines House Committee on Games and

8  Amusements approved a motion to ban Wynn Resorts from opening any gaming operations in

9  the Philippines.

10     98.   On March 12, 2012, Aruze USA and Universal filed the Counterclaim.  Among

11 other things, the Counterclaim alleges that the redemption was void *ab initio* because the

12 Stockholders Agreement, by its terms, either precludes the redemption of Aruze USA's stock

13 altogether or, alternately, the transfer restrictions are not binding on Aruze USA to the extent that

14 they constitute an illegal restraint on alienability, and thus could not legitimately impact the

15 value of Aruze USA's shares so as to support a discount against the market price.  Furthermore,

16 the Counterclaim alleges that in determining the redemption price for Aruze USA's almost 20%

17 shareholder interest in the Company, Wynn Resorts relied solely on one opinion from Moelis &

18 Company ("Moelis"), *which has done business with Wynn Resorts in the past,* and was

19 anything but independent:

20      Mr. Wynn and Kenneth Moelis ("Mr. Moelis") – the founder of Moelis –
        go way back.  Mr. Moelis first worked with Mr. Wynn when Mr. Moelis
21      worked at the investment banking firm of Drexel Burnham Lambert
        ("Drexel").  At Drexel, Mr. Moelis was the banker who helped Mr. Wynn
22      finance his Golden Nugget Casino in Atlantic City and Mirage Casino in
        Las Vegas.  On information and belief, Mr. Wynn has a close personal and
23      professional relationship with Mr. Moelis.  According to press reports,
        Mr. Moelis has stated that he would take the first flight out of LAX to rush
24      to the assistance of Mr. Wynn.  Mr. Wynn reciprocates Mr. Moelis'
        loyalty and support.  Mr. Wynn engaged Mr. Moelis to serve as the lead
25      underwriter of Wynn Resorts' $210 million common stock offering in
        March 2009.
26                          *  *  *
        Mr. Wynn called on Mr. Moelis' loyalty in this case.  Despite the fact that
27      at least some of the stock was exempted from the Stockholders

28

Agreement, Moelis discounted Aruze USA's more than $2.7 billion shares of Wynn Resort stock by a round 30%.

**E.    Damage Suffered by Wynn Resorts**

99.    In addition to reputational damage, and the possible loss of licensing opportunities, an FCPA investigation can cost a company tens of millions of dollars in legal fees and possible fines.  Legal fees for the company and its directors in this type of investigation can grow quickly.  For example, Avon has disclosed it was spending $95 million in 2010 dealing with a Foreign Corrupt Practices Act investigation that has been going on since 2008.

100.    Wynn Resorts will also see burgeoning legal costs from its lawsuit against Mr. Okada, as well as the Counterclaim.

101.    Not only does Wynn have to pay its own lawyers, but it may have to pay for Mr. Okada's legal counsel in defending against the Company's lawsuit.  Wynn's articles of incorporation are typical of publicly traded companies by providing for indemnification of legal fees resulting from litigation related to a director's conduct.  By accusing him of breaching his fiduciary duty as a director, the Company may be liable for any costs in defending against its lawsuit.

102.    In addition, the indemnification provision covers government investigations, so to the extent the SEC and Justice Department scrutinize Mr. Okada for his actions as a director of Wynn Resorts, the Company may be responsible for paying those legal fees as well.

103.    In short, this is only the beginning of Wynn Resorts battles as it faces a potentially lengthy investigation by the SEC, along with protracted litigation with Mr. Okada.  As was recently stated in an article in the *New York Times*, "[t]he company may well see its legal costs take a sizable bite out of profits over the next few quarters."

27

## **ALLEGATIONS RELATING TO DEFENDANTS' DUTIES**

104.    The Company's bylaws, articles of incorporation, as well as Board Committee charters specifically set forth the duties and obligations that Board members are required to fulfill on behalf of the Company.

105.    For example, the Company's Corporate Governance Guidelines require Directors to: "spend the time and effort necessary to discharge their responsibilities.   Accordingly, a Director is expected to regularly attend meetings of the Board and the committees on which the Director sits, and to review prior to meetings material distributed in advance for such meetings."

106.    The Corporate Governance Guidelines set forth specific criteria for membership on the Board, which includes the requirements imposed by the Nevada Gaming Commission or any other relevant licensing board or regulatory authority, states that "a candidate's demonstration, by significant accomplishment in his or her field, of an ability to make a meaningful contribution to the Board's oversight of the business and affairs of the Company, and a reputation for honest and ethical conduct in both personal and professional activities."

107.    The Corporate Governance Committee charter further specifies that the Board is to have three standing committees: (1) Audit Committee; (2) Nominating and Corporate Governance Committee; and (3) Compensation Committee.   In fact, according to the Corporate Governance Committee Charter, all committees are required to report regularly to the full Board.

108.    Specifically, the Audit Committee bylaws specifically state that: "Each member shall be able to read and understand fundamental financial statements, including a company's balance sheet, income statement, and cash flow statement and at least one member of the Committee must be an 'audit committee financial expert' as defined in the Exchange Act and as determined by the Board.   As discussed above, Defendants Goldsmith, Shoemaker, Wayson and Zeman are all designated by the Board as "audit committee financial experts."

109.    The Audit Committee is further responsible for overseeing and ensuring that the Company's financial statements are reviewed and in compliance with the law.   Specifically, the Audit Committee charter states "[p]rior to their filing with the SEC or other publication, review

and discuss with the Corporation's independent auditors and management the Corporation's audited financial statements, including the Corporation's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations.'"

110.    Moreover, according to its charter, the Audit Committee is further required to "[r]eview with the Corporation's legal advisers legal matters that may have a material effect on the financial statements, the Corporation's compliance policies and any material reports or inquiries received from regulators or governmental agencies relating to any matter that may have a material effect on the Corporation's financial statements."

111.    As to maintenance and oversight of the Company's operations and internal controls, the Audit Committee Charter requires that its members:

- review with the Corporation's independent auditors and financial management the adequacy and effectiveness of the Corporation's system of internal accounting controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Committee by the independent auditors or management; and

- review the scope and results of the Corporation's internal auditing procedures and practices and oversee the effectiveness of the internal audit function, including periodically reviewing and discussing with the Corporation's independent auditors and financial management the responsibilities, budget and staffing of the internal audit function.

112.    The Audit Committee is further required, pursuant to its bylaws to oversee compliance with legal and regulatory requirements and properly monitor and oversee the Company's risk policies. Specifically, the Audit Committee is required to:

- oversee the Corporation's compliance program with respect to legal and regulatory compliance, and oversee the Corporation's policies and procedures for monitoring compliance;

- review from time to time and make recommendations to the Board with respect to the Corporation's Code of Business Conduct and Ethics and other policies relating to management conduct, and oversee procedures and practices to promote compliance therewith.   Such policies shall include, without limitation, those relating to (1) transactions between the Corporation and members of its management, (2) *political contributions and other sensitive payments,* (3) *compliance with the Foreign Corrupt Practices Act,* and (4) corporate or competitive opportunities offered to or enjoyed by members of management;

- review at least annually the implementation and effectiveness of the Corporation's compliance program with the General Counsel and the Compliance Officer, who shall have the authority to communicate directly to the Audit Committee promptly, about actual and alleged violations of the Corporation's Code of Business Conduct and Ethics, including any matters involving criminal or potential criminal conduct; and

- discuss periodically with management, receive relevant reports regarding, and oversee management's evaluation of the Corporation's major risk exposures and, without limiting the foregoing, the Corporation's credit, related party, construction and financial risk exposures, and the steps management has taken or proposes to take to monitor and control such exposures.

113.   Under Nevada law, the Board bears ultimate responsibility for the management of Wynn Resorts. Nev. Rev. Stat §78.120 provides that "the board of directors has full control over the affairs of the corporation."   Nevada law places limits on directors' discretion so that corporations might act lawfully and serve the interest of their shareholders.   "Directors and officers shall exercise their powers in good faith and with a view to the interests of the corporation." Nev. Rev. Stat §78.138.

114.    The Board is also required to act consistently with Wynn Resorts' Code of Business Conduct and Ethics (the "Conduct and Ethics Code."). Violations of the Conduct and Ethics Code are supposed to result in "disciplinary action, up to and including discharge."

115.    The Conduct and Ethics Code provides that:

The Company operates in more than one country and interacts with many different cultures. What is appropriate in some parts of the world may be entirely inappropriate or even unlawful in others. You should always abide by the laws, rules and regulations of the country in which you are conducting business, the federal law of the United States of America and applicable laws of the State of Nevada and the Macau Special Administrative Region. You should also abide by generally accepted business practices of the countries in which you are conducting business, unless they conflict with any of the foregoing laws, rules and regulations, in which case you are to abide by the law.  If there is a conflict between local laws and this Code or any other law applicable to the conduct of the Company's business, you should consult with the Legal Department before taking any action.

116.    The Conduct and Ethics Code sets forth specific mandates regarding payments of money or anything of value to foreign officials.  In relevant part:

The Company's Policy Regarding Payments to Foreign Officials, the U.S. Foreign Corrupt Practices Act (the "FCPA"), and the laws of many other countries prohibit the Company and its officers, employees and agents or other third parties from giving or offering to give money or anything of value, directly or through an intermediary, to a foreign official, employees of a state-owned company, a foreign political party, a party official or a candidate for political office in order to attempt to influence official acts or decisions of that person or entity, to obtain or retain business, or to secure any improper advantage.

117.    The Corporate Governance Guidelines adopted by the Wynn Resorts' Board set forth specific rules for board members "with a view to enhancing stockholder value."

118.    The Corporate Governance Guidelines provide that:

The Board's goals are to build value for the Company's stockholders and to promote the vitality of the Company for its customers, employees and the other individuals and organizations that depend on the Company.

To achieve these goals, the Board monitors the performance of the Company (in relation to its goals, strategy, risks and competitors) and, through the Compensation Committee, evaluates and addresses the performance of management, including the Chief Executive Officer.

119.    According to its 2011 proxy statement, Wynn Resorts' Audit Committee is responsible for, among other things, "overseeing the Company's compliance program with respect to legal and regulatory compliance, and the Company's policies and procedures for monitoring compliance."

120.    Board Audit Committee members hold additional responsibilities regarding Wynn Resorts' compliance with the law.  The Audit Committee charter, in relevant part, provides that committee members:

> Oversee the Corporation's compliance program with respect to legal and regulatory compliance, and oversee the Corporation's policies and procedures for monitoring compliance.
>
> Review from time to time and make recommendations to the Board with respect to the Corporation's Code of Business Conduct and Ethics and other policies relating to management conduct, and oversee procedures and practices to promote compliance therewith.  Such policies shall include, without limitation, those relating to (1) transactions between the Corporation and members of its management, (2) political contributions and other sensitive payments, (3) compliance with the Foreign Corrupt Practices Act, and (4) corporate or competitive opportunities offered to or enjoyed by members of management.

121.    According to its 2011 proxy statement, Wynn Resorts' Nominating and Corporate Governance Committee is responsible for, among other things, "developing and recommending to the Board of Directors a set of corporate governance principles applicable to the Company and overseeing corporate governance matters generally."

122.    Board Nominating and Corporate Governance Committee members hold additional responsibilities regarding Wynn Resorts' compliance with the law.  The Nominating and Corporate Governance Committee charter, in relevant part, provides that committee members:

> [] recommend that the Board establish such special committees as may be desirable or necessary from time to time in order to address ethical, legal or other matters that may arise.  The Committee's power to make such a recommendation under this Charter shall be without prejudice to the right of any other committee of the Board, or any individual director, to make such a recommendation at any time.

123.    According to its 2011 proxy statement, Wynn Resorts' Compliance Committee "primarily oversees risks relating to regulatory, security and political compliance."

## DEMAND FUTILITY ALLEGATIONS

124.    During the illegal and wrongful course of conduct at the Wynn Resorts and through the present date, the Wynn Resorts' board consisted of the Defendants.  As a result of the facts set forth throughout this complaint, pursuant to the laws of Nevada, and Wynn Resorts' state of incorporation, the demand on the Wynn Resorts' Board to institute this action against directors of Wynn Resorts was not necessary because such a demand would have been a futile and useless act, particularly for the following reasons:

125.    All the Defendants knowingly participated in, approved and permitted the wrongs alleged herein to have occurred.  The acts complained of include the knowing approval of violations of state and federal law by Wynn Resorts' directors that were incapable of ratification. The acts complained of include the knowing approval of violations of Wynn Resorts Conduct and Ethics Code by its directors that were incapable of ratification.  Because the acts complained of are *ultra vires* and illegal acts, the business judgment rules provide Defendants with no protection.

126.    Additionally, based on the foregoing facts, the majority of the Board is neither independent of Defendant Stephen Wynn nor capable of acting independently and in the best interests of the Company.  Moreover, the Board's actions, in allowing its directors and officers to engage in *ultra vires* acts cannot be considered conduct protected by the business judgment rule. Notably, "Mr. Wynn, has run Wynn Resorts as a personal fiefdom, packing the Board with friends who do his personal bidding, and paying key executives exorbitant amounts for their unwavering fealty."  Counterclaim of Wynn Resorts Majority Shareholder, Aruze USA, Inc., in *Wynn Resorts, Limited v. Okada*, Case No. 2:12-cv-00400 (D. Nev.) (ECF No. 5)(the "Counterclaim").

127.   Defendant Stephen Wynn is an iconic figure in the gaming industry. Excepting Okada, Stephen Wynn dominates the Wynn Resorts' Board. Stephen Wynn's domination over the Wynn Resorts' Board is evidenced by a longstanding voting agreement dating back to April 2002 that insures that a majority of the Wynn Resorts' Board would be comprised of candidates specifically chosen by Stephen Wynn. On January 6, 2010, the parties agreed "to vote all Shares held by them . . . in a manner vote in manner so as to elect to Wynn's Board of Directors each of the nominees contained on each and every slate of directors endorsed by SAW [Stephen A. Wynn]." The direct effect of this agreement has been that no person can serve on Wynn Resorts Board unless they are chosen by Stephen Wynn, even though the Board's Nominating and Governance Committee has supposed responsibility for choosing candidates for Wynn Resorts' Board.

128.   Upon information and belief, the structure of these voting agreements relating to the Wynn Resorts Board dates back to Defendant Stephen Wynn's acrimonious boardroom battles in 2000 relating to the MGM Grand, Inc. merger with Mirage Resorts, Inc., which saw Stephen Wynn ousted as Chief Executive Officer. As result, Defendant Stephen Wynn became determined to never lose control of the Board of any future company by, first and foremost, insuring only Board members with loyalty to Stephen Wynn were even allowed to be nominated for shareholder vote.

129.   As set forth above, Mr. Wynn violated the Stockholders Agreement by failing to endorse or approve Aruze's slate of proposed directors. Mr. Wynn's actions were designed to maintain his absolute control over the Board.

130.   Thus, each member of the Board of Wynn Resorts has been hand-selected by Defendant Stephen Wynn and is loyal to him, such that it would not exercise independence.

131.   According to its 2011 proxy statement, Wynn Resorts acknowledges that Defendants *Stephen Wynn, Okada, Elaine Wynn, Schorr and Chen* are not independent directors because they do not meet the independence criteria of the NASDAQ listing standards. Therefore, under applicable NASDAQ standards, these five defendants cannot be considered

1  independent and would be unable to fulfill their fiduciary obligations to consider a pre-suit

2  demand with the required degree of impartiality and objectivity.

3       132.   Defendant **Stephen Wynn** could not comply with the fiduciary duties to

4  independently consider a pre-suit demand to bring the claims alleged herein because he is

5  employed by Wynn Resorts as its Chief Executive Officer.  Defendant Stephen Wynn's

6  employment with Wynn Resorts makes him independence-impaired because he is beholden to,

7  and financially dependent on, Wynn Resorts.  Moreover, as alleged herein, Stephen Wynn is

8  directly implicated in the improper and illegal acts giving rise to this complaint.  Therefore,

9  Stephen Wynn would not be able to vigorously prosecute any such action and cannot, in good

10  faith, exercise independent business judgment to determine whether to bring this action against

11  himself.

12       133.   Defendant **Okada** could not comply with the fiduciary duties to independently

13  consider a pre-suit demand to bring the claims alleged herein because he is directly implicated in

14  the improper and illegal acts giving rise to this complaint.  Therefore, Okada would not be able

15  to vigorously prosecute any such action and cannot, in good faith, exercise independent business

16  judgment to determine whether to bring this action against himself.

17       134.   Defendant **Schorr** could not comply with the fiduciary duties to independently

18  consider a pre-suit demand to bring the claims alleged herein because he is employed by Wynn

19  Resorts as Chief Operating Officer.  Defendant Schorr's employment with Wynn Resorts makes

20  him independence-impaired because he is beholden to, and financially dependent on, Wynn

21  Resorts and Stephen Wynn for his continued employment.  Defendant Schorr received over

22  $23.1 million in total compensation from Wynn Resorts from 2008 through 2010.  Schorr, thus,

23  has benefited from the wrongdoing herein alleged and has engaged in such conduct to preserve

24  his position of control and the perquisites thereof, and, as such, is incapable of exercising

25  independent objective judgment in deciding whether to bring this action.  Moreover, Defendant

26  Schorr owes his position on the Wynn Resorts Board to Stephen Wynn.

27

28

135.   Defendant *Chen* could not comply with the fiduciary duties to independently consider a pre-suit demand to bring the claims alleged herein because she is employed by Wynn Resorts as President, Wynn International Marketing, Ltd.  Defendant Chen's employment with Wynn Resorts makes her independence impaired because she is beholden to and financially dependent on Wynn Resorts.  Defendant Chen received over $41 million in total compensation from Wynn Resorts and/or its affiliates from 2008 through 2010.  In 2010, the Company purchased a home in Macau for use by Chen for approximately $5.4 million and expended additional funds to renovate the home.  In late 2011, it was reported that Wynn Resorts and/or its affiliates offered to pay Chen a $10 million bonus if she stayed with the Company through 2021.  Furthermore, Wynn Macau employs Ms. Chen's husband, paying him a salary of $572,000 in 2010.  Chen and her family have, therefore, benefited from the wrongdoing herein alleged and she has engaged in such conduct to preserve her position of control and the perquisites thereof, and as such is incapable of exercising independent objective judgment in deciding whether to bring this action.

136.   Defendant *Elaine Wynn* could not comply with the fiduciary duties to independently consider a pre-suit demand to bring the claims alleged herein because she was, from 1963 to 1986 and from 1991 to 2009, the spouse of Stephen Wynn, who is directly implicated in the improper and illegal acts giving rise to this complaint.  Moreover, according to a recent report from *GMI Ratings*, "the company also employs Elaine Wynn's brother and his wife as hosts at one of the company's Las Vegas hotels.  Previously, the company also employed another one of Ms. Wynn's relatives.  In 2010, salary payments and severance agreements paid to Ms. Wynn's relatives totaled $2.4 million."  In light of the compensation paid, and being paid, to family members by the Company, Ms. Wynn suffers from an inherent conflict of interest and is incapable of exercising independent objective judgment in deciding whether to bring this action.

137.   Defendant *Irani* could not comply with the fiduciary duties to independently consider a pre-suit demand to bring the claims alleged herein because he was hand-picked by

1   Stephen Wynn, who is directly implicated in the improper and illegal acts giving rise to this

2   complaint, to serve as a director for the Company. Because Defendant Irani was personally

3   selected for board membership by Stephen Wynn, he is incapable of exercising independent

4   objective judgment in deciding whether to bring this action.

5         138.     Defendants *Stephen Wynn, Chen, Zeman and Schorr* could not comply with the

6   fiduciary duties to independently consider a pre-suit demand to bring the claims alleged herein

7   because each are implicated in the improper and illegal acts alleged herein by virtue of their

8   positions as officers and directors of Wynn Resorts' Macau subsidiaries, the primary

9   beneficiaries of the wrongdoing alleged herein. Stephen Wynn serves as the Chairman and Chief

10  Executive Officer of Wynn Macau, Limited. Defendant Chen is the Chief Operating Officer of

11  Wynn Resorts (Macau), S.A., and is a member of the Board of Directors of Wynn Macau,

12  Limited. In addition, Chen is responsible for managing the Company's global marketing efforts

13  and is involved in operations and strategic development of Wynn Macau. She is also a member

14  of the Nanjing Committee of the Chinese People's Political Consultative Conference (Macau).

15  Zeman is the Vice Chairman and a member of the Board of Directors of Wynn Macau, Limited.

16  Zeman has been described in Wynn Resorts investor materials as a "guiding force in the

17  development of [the Company's] Macau operations and the continued operation and strategic

18  focus of Wynn Macau." Schorr is a non-executive Director of Wynn Macau, Limited since

19  September 2009. Defendants Stephen Wynn, Chen, Zeman and Schorr would not be able to

20  vigorously prosecute any such action and cannot, in good faith, exercise independent business

21  judgment to determine whether to bring this action against themselves.

22        139.     The Audit Committee was comprised of Defendants *Moran, Goldsmith,*

23  *Shoemaker, Wayson and Zeman* during the Relevant Period. In derogation of their duties, these

24  Defendants failed to oversee the Corporation's compliance program with regard to payments to

25  foreign officials and the FCPA. Therefore, Defendants Moran, Goldsmith, Shoemaker, Wayson

26  and Zeman would not be able to vigorously prosecute any such action and cannot, in good faith,

27

28

1  exercise independent business judgment to determine whether to bring this action against

2  themselves.

3      140.    The Nomination and Corporate Governance Committee was comprised of

4  Defendants *Irani, Miller, Moran and Zeman* during the Relevant Period.  In derogation of their

5  duties, these Defendants failed to oversee corporate governance matters at the Company,

6  specifically by failing to address ethical and legal concerns with regard to payments to foreign

7  officials and the Company's compliance with the FCPA. Therefore, Defendants Irani, Miller,

8  Moran and Zeman would not be able to vigorously prosecute any such action and cannot, in

9  good faith, exercise independent business judgment to determine whether to bring this action

10  against themselves.

11      141.    The Compliance Committee was comprised of Defendants *Miller and Schorr*

12  during the Relevant Period.

13      142.    The Compliance Committee is not an independent committee of the Board.

14  Rather, it is made up of one Wynn Resorts director, former Nevada Governor Bob *Miller*, and

15  Wynn Resorts insider, *Schorr*.  On information and belief, each member of Wynn Resorts'

16  Compliance Committee depends on Mr. Wynn for his livelihood and each is beholden to

17  Mr. Wynn.  On information and belief, Mr. Wynn has plenary control over the Compliance

18  Committee.  In derogation of their duties, the members of the Compliance Committee failed to

19  oversee risks relating to the Company's non-adherence with the FCPA.  Therefore, Defendants

20  Miller and Schorr would not be able to vigorously prosecute any such action and cannot, in good

21  faith, exercise independent business judgment to determine whether to bring this action against

22  themselves.

23                       **FIRST CLAIM FOR RELIEF**

24                       (*Breach of Fiduciary Duty*)

25      143.    Plaintiff incorporates by reference and realleges each and every allegation

26  contained above, as though fully set forth herein.

27

28

144.   The Defendants each owe (or owed) Wynn and its shareholders the highest fiduciary duties of loyalty, good faith, fair dealing, and due care in managing and administering the company's affairs.

145.   The Defendants have (or had) a duty to the Company and its shareholders to establish and maintain adequate internal controls to ensure the company was operated in a prudent and lawful manner.   The Defendants had an affirmative obligation to install an internal control system to uncover wrongdoing.   Moreover, the Defendants had an obligation to ensure that, at all times, the Company, its officers and directors acted in compliance with the law as detailed herein.   The Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things:

   a.   The Defendants failed to ensure that Wynn Resorts, its officers and directors complied with federal and state laws and Wynn Resorts' own code of conduct; and

   b.   The Defendants breached their fiduciary duties of loyalty and good faith by voting to allow Wynn Resorts, through its subsidiaries, to make a $135 million donation to the University of Macau Development Foundation.

146.   As a direct and proximate result of the Defendants' breach of their fiduciary duties, Wynn Resorts has been damaged, not only monetarily, but also to its corporate image and goodwill.   Such damage includes, among other things, the cost of defending Wynn Resorts against government investigations and the penalties, fines and other liabilities and expenses associated with those investigations.

147.   As a result of the misconduct alleged herein, the Defendants are liable to the Company, and their continuing violations of duty should be enjoined.

## SECOND CLAIM FOR RELIEF

*(Waste of Corporate Assets)*

148.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

39

149.    As a direct and proximate result of the Defendants' conscious breaches of their fiduciary duties of loyalty, good faith, fair dealing, and due care, Defendants have wasted, and continue to waste, precious corporate assets and, thus, the Company has been harmed.  As a result of the misconduct alleged herein, each Defendant is liable to the Company for their waste of tens of millions of dollars of corporate assets on an *ultra vires* and illegal act.

### THIRD CLAIM FOR RELIEF

*(Permanent Injunction)*

150.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein, to the extent not inconsistent with a claim for an injunction.

151.    Defendants' pledge on behalf of Wynn Resorts to the University of Macau Development Foundation to pay $135 million over 11 years was a breach of fiduciary duty, an *ultra vires* act, and an illegal act in violation of federal and state laws, or the law of the jurisdiction where such payment is made or intended to be made.

152.    Plaintiff seeks a permanent injunction enjoining any payment by Wynn Resorts, its subsidiaries, or affiliates to any governmental entity, subsidiary, affiliate or employee of any governmental entity in violation of federal and state laws, or the law of the jurisdiction where such payment is made or intended to be made.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law and demand is excused;

B.      Awarding, against all Defendants and in favor of Wynn Resorts, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.      Awarding to Wynn Resorts restitution from Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

40

D.     Enjoining any future payments by Wynn Resorts or its affiliates on the $135 million pledge made to the University of Macau Development Foundation;

E.     Directing Wynn Resorts to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

F.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 17, 2012

By: _____
John P. Aldrich, Esq.
ALDRICH LAW FIRM, LTD.
1601 S. Rainbow Blvd., Suite 160
Las Vegas, Nevada 89146
Telephone: (702) 853-5490
Facsimile: (702) 227-1975

COHEN MILSTEIN SELLERS
   & TOLL PLLC
Christopher Lometti
Richard Speirs
Daniel B. Rehns
88 Pine Street, 14th Floor
New York, New York 10005
Tel:  (212) 838-7797
Fax:  (212) 838-7745
clometti@cohenmilstein.com
rspeirs@cohenmilstein.com
drehns@cohenmilstein.com

Daniel S. Sommers
1100 New York Avenue, NW, Suite 500 West
Washington, D.C. 2005
Tel:  (202) 408-4600
Fax:  (202) 408-4699
dsommers@cohenmilstein.com

41

VERIFICATION

I, *Paul D'Abbraccio*, *Fund Administrator* for Excavators Union Local 731 Welfare Fund, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Wynn Resorts Limited and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that Excavators Union Local 731 Welfare Fund is a current holder, and has been a holder, of Wynn Resorts Limited common stock at all relevant times.

_____4/12/12_____
Date

_____
Name